# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERTO ALVARADO,<br><br>    Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Case No. 1:16-cv-00746-SAB<br><br>ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL<br><br>(ECF Nos. 19, 29) |

**I.**

**INTRODUCTION**

Plaintiff Roberto Alvarado ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from obesity, hepatitis C, polysubstance abuse, herpes, hypothyroidism, mild hearing loss, incipient cataracts, diverticulosis, history of premature beats, bilateral knee degenerative joint disease and history of meniscus tear, depressive disorder, and severe post-traumatic stress disorder ("PTSD"). For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge. (See ECF Nos. 7, 8.)

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed a Title XVI application for supplemental security income on December 10, 2012. (AR 71.) Plaintiff's application was initially denied on March 6, 2013, and denied upon reconsideration on June 19, 2013. (AR 124-128, 131-135.) Plaintiff requested and received a hearing before Administrative Law Judge Cynthia Floyd ("the ALJ"). Plaintiff appeared for a hearing on September 11, 2014. (AR 26-70.) On October 27, 2014, the ALJ found that Plaintiff was not disabled. (AR 8-21.) The Appeals Council denied Plaintiff's request for review on March 25, 2016. (AR 1-4.)

### A. Relevant Hearing Testimony

Plaintiff appeared with counsel and testified at the September 11, 2014 hearing. (AR 31-64.) Plaintiff was born on May 1, 1957. (AR 31.) Plaintiff is 5 foot 4 inches tall and weighs 189 pounds. (AR 32.) His normal weight is 165 to 170 pounds. (AR 32.) He is single with no living children. (AR 32-33.) Plaintiff currently resides with his parents and dog. (AR 32.) Plaintiff does not have a valid driver's license due to unpaid parking tickets. (34.)

Plaintiff has two years of college and has vocational training in welding and auto mechanics. (AR 35-36.) Plaintiff was a tank gunner in the Army from 1975 to 1978, and received an honorable discharge. (AR 36.) Plaintiff worked in construction prior to applying for supplemental security income. (AR 40.) When he was working, Plaintiff went from being a worker to running a crew. (AR 62.) He was trying to get his contractor's license. (AR 62.) Plaintiff got into carpentry by taking classes though the unemployment office. (AR 62.) In 1989, Plaintiff had a back injury and the doctor told him that he would not be able to work construction anymore, but within a year he was back at work. (AR 33.) He has not worked since December 10, 2012. (AR 36.) Plaintiff stated he has not applied for any jobs since he applied for disability benefits, but he asked to see if anyone would let him work. (AR 37.) No contractor will allow him to work with power tools because of the medication he takes. (AR 37.) Plaintiff did attempt to become self-employed by selling t-shirts a couple of years ago, which lasted about four hours. (AR 37.)

In 2004 or 2005, Plaintiff supported himself by recycling. (AR 34.) He made about $100 per month. (AR 34.) Plaintiff has gotten food from service agencies in Merced. (AR 39.) He also receives support from family members. (AR 39-40.) Plaintiff has not worked in carpentry since 2003, but up until 2006 was doing some work for his landlord for room and board. (AR 60-62.) Plaintiff was charging $15 per hour for his carpentry services. (AR 62.) Up to 2006, his landlord had rentals and Plaintiff would paint, change a garbage disposal, or fix a broken window as work was needed to be done. (AR 63.) He might have worked 10 hours per month. (AR 63.) He would lift 15 to 20 pounds. (AR 63.)

Plaintiff is unable to work due to pain throughout his body, memory lapses, and injuries he has suffered. (AR 38.) Plaintiff is afraid to work because he cannot do what he used to be able to do. (AR 40.) Plaintiff has a lot of experience in the construction field, but he is not able to move around and walk like he used to. (AR 40.) Plaintiff has a lot of injuries that are not listed in the medical record; like a fractured elbow, dislocated clavicle, broken thumb, and he hurt his arm so he can no longer straighten it out. (AR 40.) Plaintiff did not go to the doctor for any of these injuries. (AR 40.)

Plaintiff fell into some trusses and hurt his ribs but did not go to the doctor because he was working out of town. (AR 41.) He hurt his back again and did not go to the doctor because he was working out of town. (AR 41.) Plaintiff needed to work more than he needed to have his injuries addressed so he just kept working. (AR 41.) Plaintiff had a broken jaw that the doctors took an x-ray of and did not treat. (AR 41.) Plaintiff's energy level is very low. (AR 53-54.) Plaintiff has pain in all his bones from his feet to his neck. (AR 57.)

Plaintiff asked the doctors in 2003 or 2004 to fix his knees. (AR 42.) The doctors told him they did not want to repair it and would not operate. (AR 42.) Plaintiff was escorted out of the doctor's office when he was told that they would not fix his knees because Plaintiff "kind of got cruel with him." (AR 43.) Plaintiff has not had any injections in his knees but does wear braces on both knees. (AR 42-43.) The braces were prescribed by Dr. Lovell. (AR 43.)

Plaintiff is able to stand for a maximum of twenty minutes before needing to sit down. (AR 43.) Since 2012, Plaintiff would be able to lift 20 pounds. (AR 44.) Plaintiff's

impairments only allow him to do chores for about twenty to thirty minutes at a time before having to take a break for an hour or more. (AR 45.) Plaintiff has difficulty stooping; he can only stoop so far before he has trouble getting back up. (AR 58.) He is also unable to kneel or crouch, and requires assistance to get back up. (AR 58.)

Plaintiff last used alcohol a couple days prior to the hearing. (AR 50.) He enjoys drinking beer, but does not drink like he used to. (AR 51.) He wants to get into a program for his Hepatitis C but they will not accept alcoholics. (AR 51.) There were 60 people in the program when he started and Plaintiff is the only one that has stayed with the program. (AR 51.) For a year, Plaintiff has almost quit drinking completely. (AR 51.) The VA will not give him interferon so he started drinking again. (AR 51.) Plaintiff had been in the program for three years and they told him that he needs to have his white blood cell count tested. (AR 52.) He was receiving antiviral medication for his Hepatitis C but he wanted interferon. (AR 51-52.) Plaintiff was told that since he stopped drinking his blood cell count was down so he did not need to take the medication. (AR 52.) Then, he was told that he needed to have testing on his thyroid and he was given another pill to take. (AR 52.) Plaintiff was told that he needed to take that medication for another year to raise some of his counts up. (AR 52.) Plaintiff felt like they just did not want to spend the money on him and were trying to make him fall out or fail the program. (AR 52.) But, Plaintiff thought he had done extremely well in quitting everything that he was using to self-medicate before he went on the program. (AR 53.)

Plaintiff uses marijuana five times a week to help him relax or relieve his pain, and smoked the day prior to the hearing. (AR 56.) The marijuana gets him euphoric and gives him happy thoughts. (AR 57.) He smoked marijuana a lot while he was working and it did not impair him. (AR 57.) In the past, Plaintiff has used methamphetamine ("meth") but has not used for almost two years. (AR 58.) Plaintiff used to consumed meth a couple of times a week and this affected his ability to concentrate. (AR 58-59.) Plaintiff also has herpes that affects his mental process and he has lost a lot of memory. (AR 56.)

Plaintiff suffers from PTSD due to some traumatic things he witnessed in the Army, which causes his heart rate to increase and his blood rate to elevate every day. (AR 47, 48-49.)

Aside from the incident where Plaintiff got verbal with his doctor, he has no problems getting along with others. (AR 49.) Plaintiff tried to overdose on his medication one time about ten years ago. (AR 49.) Plaintiff goes for mental health treatment at the VA but his appointments are few and far between. (AR 50.) He quit calling the hotline because they do not answer or call back when he leaves a message. (AR 50.)

Plaintiff takes medication for his blood pressure, thyroid, herpes, and pain. (AR 49, 55-57.) Plaintiff takes an anti-inflammatory drug to keep the swelling down when he does perform tasks such as mowing the lawn so that his knees will not swell. (AR 57.)

Plaintiff spends most of his time alone in a storage room that they converted into a bedroom for him. (AR 34-35, 49.) In a typical day, Plaintiff feels jolts of pain throughout his body. (AR 46.) He alleviates the pain by sitting or lying down on the couch and he generally lies down for about four to six hours daily. (AR 46.) When seated, Plaintiff props his legs up on the couch, which also helps to alleviate the pain. (AR 46.) Plaintiff's medication causes him to be drowsy and have dry mouth and he naps once or twice a day for about two to three hours. (AR 47.) On some occasions Plaintiff naps for four to six hours. (AR 47.)

Plaintiff has an 18-speed bike that he rides 3 to 4 times a week to go to the store, which is about 100 yards away from his residence. (AR 35.) He uses public transportation when he has to go someplace. (AR 35.) Plaintiff helps with the housework by "cleaning the table off and stuff", and mows the lawn which is approximately as big as the room in which the hearing was held. (AR 44-45, 58.) His brother is trying to help out now so Plaintiff only is mowing the lawn once or twice a month. (AR 58.)

A vocational expert ("VE"), Cheryl Chandler also testified at the hearing. (AR 59-70.)

**B.  ALJ Findings**

The ALJ made the following findings of fact and conclusions of law.

- Plaintiff has not engaged in substantial gainful activity since December 10, 2012.
- Plaintiff has the following severe impairments: bilateral knew degenerative joint disease and history of meniscus tear, depressive disorder, and severe PTSD.
- Plaintiff does not have an impairment or combination of impairments that meets or

5

medically equals the severity of one of the listed impairments.

- Plaintiff has the residual functional capacity to lift and carry 50 pounds occasionally and 25 pounds frequently; and to stand and walk 6 hours, and sit 6 hours in an 8-hour workday. He can frequently climb ramps and stairs; occasionally ladders, ropes or scaffolds; frequently stoop and kneel; occasionally crouch; and frequently crawl. Plaintiff is capable of performing simple routine tasks.
- Plaintiff is unable to perform any past relevant work.
- Plaintiff was born on May 1, 1957, and was 55 years old, which is defined as an individual of advanced age, on the date on the application was filed.
- Plaintiff has at least a high school education and is able to communicate in English.
- Transferability of job skills is not material to the disability because Plaintiff is not disabled whether or not he has transferable job skills.
- Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy he can perform.
- Plaintiff has not been under a disability as defined by the Social Security Act from December 10, 2012, through the date of decision.

(AR 13-21.)

## III.

## LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is

susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

IV.

**DISCUSSION AND ANALYSIS**

The sole issue that Plaintiff raises on appeal is the ALJ's finding regarding Plaintiff's credibility. Plaintiff argues that the ALJ failed to articulate specific and legitimate, much less clear and convincing, reasons to reject Plaintiff's testimony.[2] Defendant responds that the ALJ pointed out specific testimony that was not credible and reasons to support the finding.

**A.     Legal Standard**

Determining whether a claimant's testimony regarding subjective pain or symptoms is credible, requires the ALJ to engage in a two-step analysis. Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012.) The ALJ must first determine if "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter v. Astrue, 504 F3d. 1028, 1036 (9th Cir. 2007) (internal punctuation and citations omitted). This does not require the claimant to show that his impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms. Smolen, 80 F.3d at 1282.

Second, if the first test is met and there is no evidence of malingering, the ALJ can only reject the claimant's testimony regarding the severity of his symptoms by offering "clear and convincing reasons" for the adverse credibility finding. Carmickle v Commissioner of Social Security, 533 F.3d 1155, 1160 (9th Cir. 2008). The ALJ must specifically make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony. Moisa v Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal punctuation and citations omitted).

---

[2] The Court notes that the opening brief also states that the ALJ erred by improperly considering the treating medical opinion, but Plaintiff does not present any argument or otherwise address this issue in the opening brief. (Plaintiff's Opening Brief 2:11-3:1, ECF No. 19.) Review of the brief persuades the Court that Plaintiff did not intend to raise this issue but this was boilerplate language which was not deleted from the brief.

Factors that may be considered in assessing a claimant's subjective pain and symptoms testimony include the claimant's daily activities the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage effectiveness or side effects of any medication; and other relevant factors. Lingerfelter, 504 F3d. at 1040; Thomas, 278 F.3d at 958. In assessing the claimant's credibility, the ALJ may also consider "(1) whether the claimant engages in daily activities inconsistent with the alleged symptoms; (2) whether the claimant takes medication or undergoes other treatment for the symptoms; (3) whether the claimant fails to follow, without adequate explanation, a prescribed court of treatment; and (4) whether the alleged symptoms are consistent with the medical evidence." Lingerfelter, 504 F3d. at 1040.

### B. The ALJ Provided Clear and Convincing Reasons for the Credibility Finding

Plaintiff contends that the ALJ cited boilerplate language that is insufficient to justify an adverse credibility finding. Plaintiff also argues that the ALJ simply rejects Plaintiff's testimony based on the belief that it lacks support in the medical evidence and that while the ALJ cited to Plaintiff's daily activities she offered no explanation as to how those sporadic activities render Plaintiff not credible. Defendant counters that the regulations prohibit finding a claimant disabled based solely on his subjective complaints, and the ALJ provided clear and convincing reasons to find Plaintiff not credible including the lack of evidentiary support, conservative treatment, daily activities, non-compliance with treatment, and doctor's opinions that Plaintiff was capable of working.

The ALJ found that Plaintiff's allegations are not fully credible. (AR 18.) The ALJ then continued the credibility discussion.

> The claimant complained of bilateral knee pain. However diagnostic findings showed mild to moderate osteoarthritis in the right knee and left knee. Physical examinations of the bilateral knees revealed normal gait and station with minimal crepitus, but normal ranges of motion. In addition, the claimant received conservative treatment, such as medications, and there was no mention of surgery or extraordinary therapies or hospitalizations or actual prescription of any assistive device. Thus the undersigned gives little weight to the claimant's allegations of constant and disabling pain. Furthermore, the records also showed he could perform normal activities of daily living without assistance. He was also able to do chores such as cooking, cleaning, raking the yard, walking the dog for exercise, and bike riding three to four times a week. The claimant described daily

activities, which are not limited to the extent that one would expect, given the complaints of disabling symptoms and limitations. Moreover, the claimant was also non-compliant with his prescribed treatment and missed several appointments without reasonable explanation. For these reasons, the undersigned gives little weight to the claimant's allegations of disability because they are not supported by the overall medical evidence of record or opinion evidence.

(AR 18-19 (citations omitted).)

The Court disagrees with Plaintiff that the ALJ simply set forth boilerplate language that courts have rejected as insufficient to allow for meaningful review of the credibility finding. While the ALJ did include some boilerplate language, the opinion went into detail about the specific testimony the ALJ found to not be credible and stated the evidence that undermined the testimony.

1. Inconsistencies with Objective Medical Evidence

Plaintiff argues that the ALJ's determination that Plaintiff's testimony was not credible due to it is inconsistency with the objective medical evidence is legally insufficient to discredit Plaintiff's testimony. Although an ALJ cannot make an adverse credibility determination solely based upon the lack of medical evidence, it is a factor that the ALJ can consider. Burch, 400 F.3d at 681. In his decision, the ALJ specifically noted, Plaintiff had little and only conservative treatment of his bilateral knee pain. (AR 18.) While the sparse medical evidence shows plaintiff has a medical history from a meniscus tear in 2009, administering doctors determined by physical examination and by an x-ray performed in June 2012 Plaintiff's course of treatment required pain medication and braces for both knees. (AR 16.)

**a. Medical Record**

Plaintiff was seen on August 17, 2005, to establish care and complained of palpitations and back pain after straining his back two days prior doing carpentry work. (AR 483, 484.) Plaintiff reported that he was working in home remodeling and repairs. (AR 483.) Plaintiff was found to have some mild left sacroiliac tenderness and knee pain. (AR 483.) He was prescribed Naproxen and Flexeril. (AR 483.)

On November 23, 2005, Plaintiff complained of joint pain within an hour of starting work. (AR 482.) Plaintiff had a normal examination. (AR 481.)

On May 22, 2006, Plaintiff called complaining of pain and swelling in his right thigh and pain in the upper chest wall after he was moving a refrigerator up a flight of stairs. (AR 473.) On June 6, 2006, Plaintiff stated he was lifting a refrigerator and felt a pop. (AR 468.) He was complaining of pain in his right thigh. (AR 468.) He had moderate effusion in the right knee and tenderness in the right abductor muscle and was noted to be ambulating with minimal apparent discomfort. (AR 468.) Plaintiff was seen on July 18, 2006, for an eye irritation after he got paint in his eye. (AR 465.) He had been working outside. (AR 467.) Plaintiff was diagnosed with severe conjunctivitis and possible chemical burns. (AR 465.) On December 26, 2006, Plaintiff complained of heel pain and feeling tired after 4 to 6 hours of work. (AR 462.) His legs continue to hurt after working all day. (AR 462.) Plaintiff had a normal examination, substance abuse was discussed, and AA attendance was advised. (AR 462.)

On December 17, 2007, Plaintiff reported apathy, sleep disturbance, and that he had been recently incarcerated for anger problems and requested counseling. (AR 457.) Plaintiff was referred for counseling and advised to cease using alcohol. (AR 457.) Plaintiff was seen on August 14, 2008, and reported that he felt great and denied depression. (AR 452.) Plaintiff had a normal examination. (AR 452.)

On January 21, 2009, Plaintiff reported that he was having pain in his knees and joint pain. (AR 448.) Examination of the left knee revealed "EXT NO CCE. LT KNEE NO EFFUSION, POS JOINT LINE TENDERNESS, MCL TENDERNESS AND VALGUS INSTABILITY". (AR 448.) Plaintiff was prescribed Naproxen. (AR 448.) Plaintiff had a follow up appointment on May 27, 2009, but had not gone to get his x-rays. (AR 439.)

On July 2, 2009, Plaintiff had an x-ray of his left knee which revealed slight medial subluxation and slight narrowing of the medial compartment left knee. (AR 308.) On July 14, 2009, Plaintiff was seen complaining of left knee pain after a motorcycle accident. (AR 435.) Examination showed moderate effusion of left knee. (AR 435.) On July 31, 2009, Plaintiff had an MRI of his left knee which showed "[j]oint effusion. Intrasubstance degeneration of menisci with tear in the posterior horn of medial meniscus. . . ." (AR 307-308.) The record notes "ABNORMAL:**FURTHER EVALUATION REQUIRED!!" (AR 308.) Plaintiff was seen on

September 22, 2009, for his left knee injury. (AR 340, 432.) Plaintiff also complained of pain in his ankle joints, right shoulder, and right hand. (AR 340, 432.) The record notes that the x-ray showed moderately advanced tricompartment arthritis present and reflects the July 31, 2009 MRI results. (AR 340, 432.) The record notes that Plaintiff is grossly intact and the most likely source of his symptoms is arthritis in various joints, the left knee in particular. (AR 340, 432.) The record also notes "it is unlikely that the MRI findings suggest a singular torn meniscal lesion that will afford relief with surgical treatment." (AR 340, 432.) Plaintiff was released to his primary care provider for medical management of his arthritis to include combination drug treatment, physical therapy, alterations of life style, and knee injections. (AR 340-341, 431.) Plaintiff was released from ortho being found an unlikely surgical candidate. (AR 432.)

On March 15, 2010, Plaintiff reported knee pain that hurts worse with squatting and bending but he could walk 50 yards or less without pain. (AR 416.)

On April 27, 2010, Plaintiff reported that he had been having pain of 6/10 for about a month in both knees. (AR 410.) He asked that a list of all his injuries be set forth for disability purposes. (AR 410.)

On March 9, 2012, Plaintiff was seen complaining of knee pain that hurts worse with squatting. (AR 390.) Plaintiff reported that he had developed a lateral bulge in his knee the last six months and the pain has been worsening. (AR 393.) He was able to walk 50 yards or less without pain. (AR 390.) Plaintiff was not taking his Naproxen very often. (AR 390.) .) He had medium effusion and joint line tenderness on his right knee. (AR 390.)

Plaintiff was seen for a routine follow-up on April 9, 2012. (AR 385-386.) Plaintiff complained of pain 7/10 to bilateral patellar and reported that he was not taking his Naproxen very often. (AR 385, 386.) He had medium effusion and joint line tenderness on his right knee and knee braces were ordered. (AR 385.)

On June 7, 2012, Plaintiff had bilateral x-rays of his knees. (AR 305-306.) The x-rays showed: right knee – mild to moderate tricompartment osteoarthritis, possible loose body; left knee – mild tricompartment osteoarthritis. (AR 306.)

Plaintiff was seen on February 7, 2013, complaining of some dysphagia, chokes with no

emesis. (AR 526.) His physical status is noted as "patient with mild systemic disease[.]" (AR 528.) Plaintiff was alert and oriented and had a normal physical examination. (AR 528-529.) He was scheduled for a screening colonoscopy. (AR 529.)

Plaintiff had a comprehensive physical examination by Dr. Wagner on February 12, 2013. (AR 497-501.) Plaintiff was found to have a history of hepatitis C with no history of edema, ascites, jaundice, or encephalopathy. (AR 497.) Plaintiff also complains of bilateral knee pain and the MRI of the left knee shows some meniscal degeneration, otherwise, the x-rays show mild degenerative joint disease. (AR 497-498.) Plaintiff has not had any arthrocentesis or injections and Plaintiff reports he can walk 4 to 6 blocks. (AR 498.) Plaintiff can climb stairs but uses a railing to do so. (AR 498.) Plaintiff occasionally uses knee braces when he is doing activities such as raking the yard, or walking the dog, but does not use them when he is inside his house. (AR 498.) Plaintiff also has hypertension that was somewhat elevated. (AR 498.) Plaintiff reported living with his parents. (AR 498.) He cooks, cleans, shops, performs activities of daily living without assistance, and has a "cardio machine" at home that he uses to exercise his arms and legs. (AR 498.) Plaintiff also walks the dog, rakes the yard, and does other similar activities for exercise. (AR 498.) Plaintiff denied any current drug or alcohol use. (AR 498.)

Dr. Wagner noted that Plaintiff was easily able to get up and out of his chair in the waiting room and walked with a brisk pace to the examination room without assistance. (AR 498.) Plaintiff sat comfortably and was was easily able to get on and off the examination table, bend over at the waist, take off his shoes and socks, and put them back on without any difficulty. (AR 498-499.) Plaintiff was easily able to walk on his toes and heels, had negative Romberg, normal station, normal gait, and normal finger to nose. (AR 499.) Plaintiff wore knee braces outside of his jeans and they appeared to be helpful in more high stress activities such as raking the yard or going for long walks. (AR 499.) Examination of Plaintiff's knees showed no swelling, tenderness, effusions, or ligamentous laxity. (AR 500.) Dr. Wagner stated that at the very most, there was minimal crepitus in the knees bilaterally. (AR 500.) Plaintiff had 5/5 bilateral upper and lower extremity strength, bulk, and tone. (AR 500.) Plaintiff was diagnosed with hepatitis C without any signs or symptoms of advanced cirrhotic liver disease; bilateral knee

pain with some mild degenerative joint disease in both knees; and hypertension that is somewhat poorly controlled with no history of any obvious end-organ damage. (AR 500-501.)

Dr. Wagner opined that Plaintiff can stand/walk up to six hours; has no limitation on sitting with normal breaks; should use knee braces for strenuous activities; can lift 50 pounds occasionally and 25 pounds frequently; can frequently perform postural activities, and has no manipulative or workplace environmental limitations. (AR 501.)

Plaintiff had an esophagogastroduodenoscopy with colonoscopy on February 15, 2013. (AR 518-524.) Plaintiff was diagnosed with mild sigmoid diverticulosis and had an otherwise unremarkable upper endoscopy. (AR 518, 570.) On March 14, 2013, Plaintiff had a liver ultrasound which found hepatocellular disease; cholelithiasis. (AR 547-548.) Plaintiff was seen on April 9, 2013. (AR 564.) Plaintiff was alert and oriented. (AR 564.) He was ambulating with braces and no edema was noted. (AR 546.) On April 16, 2013, Plaintiff had a normal CT of his chest. (AR 546-547.)

Plaintiff reported on August 9, 2013, that he was feeling more energetic and active but was having intermittent back pain and was not exercising. (AR 642.) He requested a CT scan for memory loss stating that he was "not feeling himself lately". (AR 643.) On August 23, 2013, Plaintiff reported severe pain in his left temple for two weeks, eye pressure, reddened left eye, and pain down his neck. (AR 635.)

Plaintiff reported on March 17, 2014 that he had stopped taking his medication and he was breaking out in herpes and was having anger, irritability and impatience. (AR 621.) Plaintiff also said that his knees were worse. (AR 621.) The record notes DJD of knees and Plaintiff was to continue his current medications. (AR 621.)

### b. The ALJ Properly Considered that Plaintiff's Complaints Were Inconsistent With the Medical Record

The ALJ noted that Plaintiff has only had little and conservative treatment for his bilateral knee pain. (AR 16.) Plaintiff was found not to be a candidate for surgery for his bilateral knee pain, and has only been treated with medication and stated he does not take the medication very often. (AR 385, 386, 390, 432.) Evidence of conservative treatment is

sufficient to discount a claimant's testimony regarding the severity of the impairment. Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007).

The ALJ also considered diagnostic findings which show mild to moderate osteoarthritis in the right and left knee. (AR 18, 305-306.) The ALJ also addressed that physical examination of the bilateral knees revealed normal gait and station with minimal crepitus, but normal range of motion. (AR 18, 500.) The determination that a claimant's complaints are inconsistent with clinical evaluations can satisfy the requirement of stating a clear and convincing reason for discrediting the claimant's testimony. Regennitter v. Commissioner of Social Sec. Admin., 166 F.3d 1294, 1297 9th Cir. 1999). The ALJ properly considered this evidence in weighing Plaintiff's credibility. "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. § 404.1529(c)(2)).

2.     Non-Compliance With Medical Treatment

The ALJ also specifically addressed that Plaintiff has a history of missing his mental health appointments. (AR 17.) In addressing Plaintiff's credibility, the ALJ found that Plaintiff was noncompliant with his prescribed treatment and missed several appointments without reasonable explanation. (AR 19, 621, 623, 629.) Review of the medical record provides substantial evidence to support the ALJ's determination that Plaintiff was non-compliant with his treatment.

On March 31, 2009, Plaintiff cancelled an appointment with gastroenterology. (AR 344.) On June 2, 2009, Plaintiff failed to show for an appointment at the GI clinic. (AR 438.) On October 16, 2009, the record notes that Plaintiff did not take his blood pressure medication. (AR 421.)

On January 26, 2010, and April 3, 2011, Plaintiff failed to show for a sleep study. (AR 342, 401.) On January 26, 2010, Plaintiff did not show for a mental health appointment. (AR 419.) On March 15, 2010, the record notes Plaintiff did not take his blood pressure medication. (AR 416.) On April 26, 2010, Plaintiff failed to show for an appointment for an orthopedic

15

examination. (AR 336.) An April 27, 2010 note reports that Plaintiff has failed to follow up with the Hep C clinic. (AR 410.)

On September 13, 2010, Plaintiff failed to show for a CDTP SUB intake appointment. (AR 406.) On October 15, 2010, Plaintiff failed to show for a psychotherapy session. (AR 404.)

On March 9, 2012, Plaintiff had not been taking his blood pressure medications. (AR 390.) On June 20, 2012, the record notes that Plaintiff has been noncompliant with his therapy for his hypertension. (AR 376.)

On September 18, 2012, Plaintiff missed his appointment because he rides his bike to the bus stop and he did not get there in time to catch the bus to Fresno. (AR 365.) Plaintiff failed to show for an appointment on December 26, 2012, and December 27, 2012. (AR 530-532.)

Plaintiff failed to show for appointments on March 27, 2013; December 18, 2013; February 6, 2014; March 12, 2014; and March 31, 2014. (AR 617, 627-629.)

It is well established in the Ninth Circuit that the ALJ may properly rely on " unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment" in determining a claimant's credibility. Molina, 674 F.3d at 1113 (citations omitted). The ALJ properly considered Plaintiff's failure to comply with his treatment in making the credibility determination.

3.  Daily Activity

Plaintiff argues that the ALJ erred in considering his daily activities of daily living without offering an explanation as to how those activities render Plaintiff not credible and that nothing in Plaintiff's testimony provides any indication that he is capable of performing anything other than basic daily activities. There are two ways for an ALJ to "use daily activities to form the basis of an adverse credibility determination: if the claimant's activity contradicts his testimony or if the claimant's activity meets the threshold for transferable work skills." Phillips v. Colvin, 61 F. Supp. 3d 925, 944 (N.D. Cal. 2014).

In this instance, the ALJ found that that Plaintiff described daily activities which are not limited to the extent that one would expect, given the complaints of disabling symptoms and limitations. (AR 18.) The ALJ considered that Plaintiff could perform normal activities of daily

living without assistance and was also able to do chores such as cooking, cleaning, raking the yard, walking the dog for exercise, and bike riding three to four times a week. (AR 18.)

On April 9, 2014, Plaintiff completed a daily activities questionnaire. (AR 282-285.) Plaintiff stated that he lived with his parents and indicated that he cleaned, washed dishes, and mowed the lawn, although he stated not enough. (AR 282.) Plaintiff indicated that he did not do activities outside the home because he did not have money. (AR 282.) Plaintiff is able to cook for himself although his mother does most of the cooking. (AR 283.) Plaintiff can take care of his personal needs. (AR 283.) Plaintiff spends most of his day watching television. (AR 283.) Plaintiff reads the newspaper for about half an hour on some days. (AR 283.) Plaintiff stated that he has lost most of his friends and has very few left but he visits with them when he sees them. (AR 284.) He participates in holidays and birthday with family and friends. (AR 284.) Plaintiff could not remember the last time that he attended a social activity. (AR 285.) Plaintiff does not always go to bed. (AR 285.) He sleeps 2 to 5 hours a night and is up from 3 a.m. to 4 p.m. (AR 285.) Plaintiff's medications make him drowsy. (AR 285.)

On July 7, 2014, Plaintiff completed a daily activities questionnaire. (AR 288-291.) Plaintiff stated that he was living with his mother, father, and brother. (AR 288.) Plaintiff does household chores only after he takes his medication. (AR 288.) Plaintiff sometimes rides his bike to the local store. (AR 288.) Plaintiff is okay with these activities when he is on his meds and if his body lets him. (AR 288.) Plaintiff states that he does not cook for himself and his brother's girlfriend prepares his meals. (AR 289.) Plaintiff is able to take care of his personal needs without assistance. (AR 289.) Plaintiff spends most of the day and night watching television. (AR 289.) Plaintiff has a black belt and brown in Judo and Karate but cannot engage in them now. (AR 289.) Plaintiff does not read. (AR 289.) Plaintiff is able to use public transportation without assistance. (AR 290.) Plaintiff visits with family members when they come over. (AR 290.) Plaintiff does not attend social activities. (AR 291.) Plaintiff sometimes goes to bed at 4 a.m. and 10 p.m. (AR 291.) Plaintiff sleeps one to four hours a night and gets up between 7:00 a.m. and 3:00 p.m. (AR 291.) Plaintiff takes naps during the day because he is tired a lot of the time. (AR 291.)

However, Plaintiff told Dr. Wagner that he cooks, cleans, shops, performs activities of daily living without assistance, and has a cardio machine at home that he uses to exercise his arms and legs. (AR 498.) Plaintiff also walks the dog, rakes the yard, and does other similar activities for exercise. (AR 498.) The ALJ properly considered that Plaintiff described activities that are not as limited as one would expect given his complaints of disabling symptoms.

### C. Conclusion

The court finds that the ALJ provided clear and convincing reasons to find that Plaintiff's testimony is not credible which are supported by substantial evidence in the record. For that reason, Plaintiff's appeal shall be denied.

## V.

## CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ did not err in determining Plaintiff's testimony was not credible.

Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED. It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Robert Alvarado. The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated: **August 9, 2017**

UNITED STATES MAGISTRATE JUDGE